# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**LEE A. LINDSEY**
          **Plaintiff,**

      **v.**                                  **Case No. 04-C-0806**

**JO ANNE B. BARNHART**
**Commissioner of the Social Security Administration**
             **Defendant.**

---

## DECISION AND ORDER

Plaintiff Lee Lindsey filed an application for disability benefits under the Social Security Act, alleging that he was unable to work due to mental problems and various bodily injuries, but the Social Security Administration ("SSA") denied his claim. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), but the ALJ also concluded that he was not disabled. The Appeals Council then denied his request for review, and the ALJ's decision became the final ruling of the SSA on his application. Indoranto v. Barnhart, 374 F.3d 470, 473 (7th Cir. 2004).

Plaintiff then filed the present action pro se seeking judicial review of the ALJ's decision, along with requests to proceed in forma pauperis and for appointment of counsel.[1] I granted his IFP request but denied without prejudice his request for counsel because it did not appear he had attempted to obtain a lawyer on his own. See Jackson v. County of

---

[1]Plaintiff also filed a request to allow more time to file his appeal. Because it was not clear to me whether the complaint was, in fact, untimely, I declined to address the request at that time. The Commissioner, who has since responded in opposition, has not alleged that the complaint was untimely; therefore, this request (R. 4) may now be denied as moot.

McLean, 953 F.2d 1070, 1072-73 (7th Cir. 1992). I stated that after contacting at least five lawyers without success plaintiff could renew his request, but he has not done so. I then established a briefing schedule pursuant to this district's policy on social security appeals.

In his main brief, plaintiff argued that the ALJ erred in evaluating the medical evidence regarding his mental impairment by crediting the opinions of SSA consultants over his doctors. He also submitted with the brief additional medical records in support of his claim. The Commissioner responded that the ALJ's decision was supported by the evidence of record, and that plaintiff was not entitled to consideration of evidence outside the administrative record. Following the filing of the Commissioner's brief, plaintiff submitted more medical records and documents. Because the reviewing court generally cannot consider evidence that was not before the ALJ, I allowed petitioner to file a supplemental brief addressing the purpose of these submissions, to which the Commissioner was permitted to respond. The matter is now fully briefed and ready for decision.

## I. APPLICABLE LEGAL STANDARDS

### A.     Disability Standard

In order to obtain disability benefits under the Social Security Act, plaintiff must be unable "to engage in any substantial gainful activity ["SGA"] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. See 20 C.F.R. §§ 404.1520; 416.920. Under this test, the ALJ must determine:

2

(1) whether the claimant is presently working;

(2) if not, whether the claimant has a severe impairment or combination of impairments;[2]

(3) if so, whether any of the claimant's impairments are listed by the SSA as being so severe as to preclude substantial gainful activity;[3]

(4) if not, whether the claimant possesses the residual functional capacity ("RFC") to perform his past work;[4] and

(5) if not, whether the claimant is able to perform any other work in the national economy in light of his age, education and work experience.

See, e.g., Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The claimant will automatically be found disabled if he makes the requisite showing at steps one through three. If he is unable to satisfy step three, he must then demonstrate that he lacks the RFC to perform his past work. If he makes this showing, the burden shifts to the Commissioner to establish that the claimant can engage in some other type of substantial gainful employment. The Commissioner may carry this burden either by relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to perform work in the national economy in light of his limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on his exertional ability, age, education and work experience. However, the Commissioner may not rely on the Grid if

---

[2]An impairment is "severe" if it significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

[3]These presumptively disabling impairments are compiled in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (i.e. "the Listings").

[4]RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of his impairments. SSR 96-8p.

3

non-exertional limitations such as pain, or mental, sensory or skin impairments might substantially reduce the claimant's range of work.  In such a case, the ALJ must solicit the testimony of a VE,  although he may use the Grid as a "framework" for making a decision.  See, e.g., Worzalla v. Barnhart, 311 F. Supp. 2d 782, 787 (E.D. Wis. 2004).

In the present case, plaintiff's primary impairment was mental.  Disability claims based on mental disorders are evaluated in essentially the same manner as claims based on physical impairments.  If the mental impairment is severe, the ALJ must determine whether it meets or equals any of the Listings.   Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036 (E.D. Wis. 2003).  The Listings of mental impairments consist of three sets of "criteria" - the paragraph A criteria (a set of medical findings), paragraph B criteria (a set of impairment-related functional limitations), and paragraph C criteria (additional functional criteria applicable to certain Listings).  The paragraph A criteria substantiate medically the presence of a particular mental disorder.  The criteria in paragraphs B and C describe the impairment-related functional limitations that are incompatible with the ability to perform SGA.  Lechner v. Barnhart, 321 F. Supp. 2d 1015, 1018 (E.D. Wis. 2004).  If the claimant satisfies the A and B, or A and C criteria, he will be considered disabled.  Wates, 274 F. Supp. 2d at 1036 (citing 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00).

There are four broad areas in which the ALJ rates the degree of functional limitation: (1) activities of daily living ("ADLs"); (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The ALJ rates the degree of limitation in the first three functional areas using a five-point scale: none, mild, moderate, marked and extreme.  The degree of limitation in the fourth area is evaluated using a four-point scale: none, one or two, three, and four or more.  The last point on each

4

scale represents a degree of limitation that is incompatible with the ability to do any gainful activity, § 404.1520a(c)(4), and a claimant with marked limitation and/or repeated decompensation in two of the four areas is also considered disabled, <u>see</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00.

As with physical impairments, if the claimant's mental impairment does not meet or equal a Listing, the ALJ evaluates the claimant's mental RFC. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00; 20 C.F.R. § 404.1520a(c)(3). Under SSR 85-16, Residual Functional Capacity For Mental Impairments, "this evaluation includes consideration of the ability to understand, to carry out and remember instructions and to respond appropriately to supervision, coworkers, and customary work pressures in a work setting." <u>See also</u> POMS DI 25020.010B.3 (listing various factors in the mental RFC analysis).

**B.    Standard of Review of ALJ's Decision**

Judicial review is limited to determining whether the ALJ's decision is supported by "substantial evidence" in the record and based on the proper legal criteria. <u>Scheck v. Barnhart</u>, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable person could accept as adequate to support a conclusion. <u>Cannon v. Apfel</u>, 213 F.3d 970, 974 (7th Cir. 2000). Thus, where conflicting evidence would allow reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the ALJ, <u>Binion v. Chater</u>, 108 F.3d 780, 782 (7th Cir. 1997), and the reviewing court may not decide the facts anew, re-weigh the evidence or substitute its judgment for that of the ALJ, <u>Powers v. Apfel</u>, 207 F.3d 431, 434 (7th Cir. 2000). If the ALJ commits an error of law, however, reversal is required without regard to the volume of evidence in support of the factual findings. <u>Binion</u>, 108 F.3d at 782.

5

The reviewing court cannot consider materials that were not before the ALJ in deciding whether to reverse his decision.  E.g., Luna v. Shalala, 22 F.3d 687, 689 (7th Cir. 1994); see also Eads v. Sec'y of Health & Human Servs., 983 F.2d 815, 817 (7th Cir. 1993) (stating that the ALJ "cannot be faulted for having failed to weigh evidence never presented to him").  However, the court may, pursuant to § 405(g), sentence six, remand the case to the Commissioner "upon a showing that there exists 'new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'"  Schmidt v. Barnhart, 395 F.3d 737, 741-42 (7th Cir. 2005) (quoting 42 U.S.C. § 405(g)).

> Evidence is "new" if it was not in existence or available to the claimant at the time of the administrative proceeding.  New evidence is "material" if there is a reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered.  Thus, new evidence is material only if it is relevant to the claimant's condition during the relevant time period encompassed by the disability application under review.

Id. at 742 (internal citations and quote marks omitted).

## II. FACTS AND BACKGROUND

At the time of the ALJ's decision, plaintiff was 39 years old, with an 11th or 12th grade education (the record contains contradictory information) and a limited employment history comprised of unskilled, short-term jobs, such as grounds-keeping, warehouse work, and janitorial work.  (Tr. at 17, 81-86, 92.)  Plaintiff filed several applications for benefits prior to the instant application, all of which were denied.  (Tr. at 15, 45.)  The instant application was filed on September 6, 2001 and alleged a disability onset date of January 1, 1988, although due to the res judicata effect of the prior denials, the ALJ determined that the earliest date plaintiff could be found disabled was January 18, 2001.  (Tr. at 17-18, 477.)  Nevertheless,

6

without re-opening the previous applications, the ALJ received and reviewed records dating back more than a decade. (Tr. at 18.)

## A. Medical Evidence

Plaintiff was seen at the Milwaukee County Mental Health Complex ("MCMHC") in May 1990 for alcohol dependence. He also complained of back pain related to a work injury, head aches, blurred vision and insomnia. (Tr. at 193-99.) During a May 30, 1990 psychiatric evaluation, the doctor found plaintiff's current mental status unremarkable, with no disturbance in thought process and content, no perceptual disturbance, and intact memory. He was referred to an urgent care clinic for a physical evaluation. (Tr. at 191.) Plaintiff failed to appear for follow-up appointments on June 7 and August 1, 1990, and on November 1, 1990, his case was closed. (Tr. at 190-92.)

Plaintiff was next seen at MCMHC on September 5, 1991 complaining of depression. He was oriented times three, well groomed, with logical thought process and no delusions or hallucinations evident. The note indicated that plaintiff had previously been provided with a one month trial of Prozac, with good response, and he wanted a refill. Plaintiff stated that he was drinking and using cocaine every day. (Tr. at 188.) He was diagnosed with depression and poly-substance abuse, with a Global Assessment of Functioning (GAF) of 50,[5] and prescribed Prozac. (Tr. at 187.)

On November 19, 1991, Dr. James Paquette completed an evaluation and report (apparently at the behest of the SSA in connection with an application for disability benefits),

---

[5]GAF is an assessment of the person's overall level of functioning. Set up on a 0-100 scale, a score of 50-60 denotes "moderate symptoms," i.e. "moderate difficulty in social, occupational, or school functioning." Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

7

indicating that plaintiff's appearance was disheveled and he was, at times, inattentive and hyperactive. Plaintiff smelled of alcohol, drank during the evaluation, and at one point urinated on himself. He described various physical injuries, complained of severe pain, and wore both a neck and back brace to the interview. He stated that he had received out-patient psycho-therapy at the MCMHC for depression in 1989 and 1991. (Tr. at 200.) Dr. Paquette's diagnostic impression was alcohol and cocaine dependence, major depression, malingering, and rule out somatoform conversion and pain disorders. (Tr. at 203.)

On January 6, 1992, plaintiff was admitted to DePaul Hospital for in-patient substance abuse treatment. However, he showed no progress in treatment and checked out AMA on January 10. (Tr. at 211-12.) Plaintiff returned to DePaul on March 23, 1992, and seemed more engaged. (Tr. at 207-10.) He returned again in December 1992 for an aftercare program. (Tr. at 206-07.)

On January 21, 1994, plaintiff was seen at the MCMHC Central Walk-in Clinic, on referral from the House of Correction. He reported that he had a sleeping disorder, was paranoid and had visions when using pot, felt depressed, and abused drugs. The intake person noted that plaintiff was nicely dressed and oriented times three. His insight and judgment were good. The diagnosis was rule out major depression. (Tr. at 185-86.) Plaintiff failed to appear for subsequent appointments in March 1994 and his case was closed. (Tr. at 183, 296-98.)

On April 14, 1994, plaintiff was evaluated by Dr. Thomas Grundle, at the behest of the SSA in connection with another application for benefits. (Tr. at 213.) Dr. Grundle found plaintiff reasonably dressed, a bit tense but cooperative. Based on his endorsing every symptom suggested, Dr. Grundle believed plaintiff may be exaggerating his symptoms.

8

Plaintiff's speech was spontaneous, logical and organized, yet he described hearing voices, seeing things and feeling things crawling on him. (Tr. at 214-15.) His mental status "was terribly compromised" to the point where he could not say how many pennies make a nickel or what the colors of the American flag were. (Tr. at 215.) However, Dr. Grundle found this inconsistent with plaintiff's presentation in that he did not appear either psychotic or seriously affectively impaired. (Tr. at 215.) Dr. Grundle's diagnoses were: alcohol dependence, cocaine abuse, rule out psychotic disorder, major depression and malingering, with anti-social personality traits and a GAF of 55. (Tr. at 216.) Dr. Grundle concluded that given his use of drugs, plaintiff could not work; however, with treatment, a more accurate assessment could be made. (Tr. at 216.)

Plaintiff received treatment for physical problems, including back and neck pain and headaches, from Dr. Vincent Lubsey from 1994 to 1996. (Tr. at 217-26.) In November 1995, plaintiff injured his right ring finger at work, rupturing a tendon. He was treated at Milwaukee Medical Clinic, assessed with 5% permanent partial disability, and released to return to work with no restrictions in January 1996. (Tr. at 227-34.)

On April 19, 1996, Dr. Roger Rattan completed a Psychiatric Review Technique form for the SSA, apparently in connection with another application. Dr. Rattan found that plaintiff had no medically determinable mental impairment. (Tr. at 237.)

In June 1996, plaintiff "was involved in a falling object accident" at work, experiencing a concussion, contusion, and head and neck strain. He was treated by Dr. James Flowers and released "with no problems and no permanency" in October 1996. (Tr. at 249, 246-70.)

On March 3, 1997, Dr. Henry Kaplan completed a Psychiatric Review Technique form for the SSA, finding that plaintiff had no medically determinable mental impairment. (Tr. at

9

273.)  Another reviewer, whose name is illegible, reviewed and affirmed the form on April 9, 1997.  (Tr. at 274.)

Plaintiff apparently re-injured his right ring finger in April 1997 while working at Taco Bell and received treatment from Dr. James Gnadt.  (Tr. at 282-86.)  In September 1997, plaintiff was seen at the Sethi Medical Clinic regarding a back strain (Tr. at 287), excused from work for about a week (Tr. at 289), and prescribed Flexeril and Naprosyn (Tr. at 176).  On October 31, 1997, plaintiff was seen at St. Michael's Hospital, apparently for a head injury, and released to return to work on November 3, 1997.  (Tr. at 306.)

Plaintiff was seen at the MCMHC in January 1998, complaining of depression and hearing voices calling his name.  (Tr. at 292-95.)  Dr. San Augustin prescribed Olanzapine, a medication for mental disorders, and Sertraline, a depression medication (Tr. at 172-73, 173-75, 177).  Plaintiff was referred to the Medical College of Wisconsin, Campus Clinic Psychiatry, and the initial intake sheet dated February 5, 1998 lists a diagnosis of major depression with psychotic features.  (Tr. at 317.)  Plaintiff was seen by Dr. Ivanovic on February 28, 1998, and complained of hearing voices and insomnia.  (Tr. at 312.)  He was diagnosed with psychosis, not otherwise specified ("NOS"); major depression; and a history of substance abuse, in remission; with a GAF of 55-60.  (Tr. at 315.)  He was provided medication.  (Tr. at 308.)  Plaintiff returned to see Dr. Ivanovic on April 8, 1998 and stated that he felt better on medication, which was continued.  (Tr. at 308, 309.)

Plaintiff returned to the MCMHC in June 2002, complaining of depression.  (Tr. at 395.)  On the June 28 intake form, the diagnoses were listed as psychosis, NOS, and rule out schizo-affective disorder, with a GAF of 45.  (Tr. at 405.)  On a June 30 mental status exam, plaintiff was oriented times three, calm, with logical thought process and no delusions

10

or hallucinations. His insight/judgment and intelligence/cognition were fair. The diagnosis was adjustment disorder with depressed mood and (per the chart) psychosis, NOS, and malingering, with a GAF of 55. (Tr. at 399.). He was provided Zoloft, Zyprexa and Trazodone (Tr. at 402) and later with Olanzapine, Sertraline and Trazodone (Tr. at 407-08).

On July 22, 2002, Dr. Evelyn Rosen evaluated plaintiff for the SSA in connection with the instant application. At the outset of the interview, plaintiff repeatedly interrupted Dr. Rosen and told her that he heard voices and wanted the door kept open. However, once Dr. Rosen firmly told him that the door would remain closed, he was able to listen to her questions. Dr. Rosen found it very difficult to obtain information from plaintiff because he was not fully cooperative, was vague in his responses, and often seemed to contradict himself. (Tr. at 410.) Dr. Rosen noted a long history of substance abuse and problems with the law. (Tr. at 411.) Plaintiff presented as clean and well-groomed, with no obvious physical problems or problems with speech, hearing or vision, and seemed to process well enough and had an appropriate affect. (Tr. at 412-13.) At times, it appeared to Dr. Rosen that he was deliberately presenting as more impaired than actually was the case, and Dr. Rosen noted that prior examiners had raised the possibility of malingering. He did not present as clinically depressed or psychotic, and there was no clinical indication of auditory or visual hallucinations or a thinking disorder. Dr. Rosen stated that plaintiff was "likely oriented for time, place and person." (Tr. at 413.) Dr. Rosen also found it likely that his memory was grossly intact, but because of his inconsistent cooperation it was not possible to be sure. His fund of general knowledge could not be determined either because he appeared to deliberately present as more cognitively impaired than he really was. (Tr. at

11

414.)  Dr. Rosen's diagnoses were rule out malingering, substance abuse, and personality disorder NOS with anti-social features, with a possible GAF of 60.  (Tr. at 416.)

On July 31, 2002, Dr. Roger Rattan completed a psychiatric review technique form for the SSA, in which he noted evidence of an affective disorder (rule out), personality disorder and substance addiction disorder, none of which met the criteria of Listings 12.04, 12.08 or 12.09.  (Tr. at 451-61.)  Under the B criteria, he found moderate limitation of social functioning, mild limitation of ADLs and concentration/persistence/pace, and one or two episodes of decompensation.  (Tr. at 461.)  Dr. Rattan also completed a mental RFC assessment, in which he concluded that plaintiff was markedly limited in his ability to deal with the general public, moderately limited in his ability to understand, remember and carry out detailed instructions, and not significantly limited in any other areas of mental functioning.  (Tr. at 447-48.)  Dr. Rattan concluded that plaintiff was capable of unskilled work not dealing with the general public.  (Tr. at 449.)

On July 23, 2003, Dr. John Pankiewicz assessed plaintiff at the request of the public defender in connection with a criminal charge plaintiff was facing.  (Tr. at 465.)  Plaintiff advised Dr. Pankiewicz that he had a "distant history of substantial problems with both drugs and alcohol" and had been abstinent since treatment at DePaul Hospital.  (Tr. at 466.)  Dr. Pankiewicz stated that plaintiff had a substantial psychiatric history, with treatment for depression in the early 1990s, and over the past four years had been regularly diagnosed with psychotic illness.  At the time, plaintiff was receiving treatment and medication from the Medical College of Wisconsin.  (Tr. at 466.)  Plaintiff reported two episodes of substantial head injury during auto accidents, the most recent occurring the previous year and requiring hospitalization for five days, and the prior injury occurring sometime in 2000.  (Tr. at 466-67.)

12

On mental status exam, plaintiff presented with intermittently rapid speech with a disorganized quality, impairment in attention and concentration, and some impairment in short-term memory. Plaintiff produced a briefcase full of papers, which he called his "records," and Dr. Pankiewicz found them to be scattered correspondence of no relevance, which he considered further evidence of impairment in thought process. Dr. Pankiewicz diagnosed plaintiff with schizo-affective disorder and possible dementia, secondary to head trauma. (Tr. at 467.) Dr. Pankiewicz concluded that plaintiff suffered from a major mental illness with significant functional impairment, that over the past five years plaintiff lacked the functional capacity to obtain consistent independent employment, and that plaintiff "is an individual who qualifies for SSI and will require continued support to maintain adequate shelter and subsistence within the community." (Tr. at 468.)

On August 7, 2003, plaintiff saw Dr. Steven Ortell of Health Care for the Homeless ("HCH"), presenting with complaints of depression, auditory hallucinations, and sleeplessness. Dr. Ortell stated that plaintiff suffered substantial head trauma in 2002 causing him permanent cognitive problems. On mental status exam, plaintiff was cooperative and friendly, with no "evidence of significant EPS or tardive dyskinesia"[6] or "significant psychomotor agitation." His speech was easily understood, although he conveyed little information. (Tr. at 471.) His affect was "euthymic,"[7] his thoughts flowed with

_____

[6]"EPS" is an "abbreviation for exophthalmos-producing substance." Stedman's Medical Dictionary 611 (27th ed. 2000). Exophthalmos is the protrusion of one or both eyeballs. Id. at 631. Tardive dyskinesia is "involuntary movements of the facial muscles and tongue, often persistent." Id. at 553.

[7]"Euthymic" means characterized by "moderation of mood, not manic or depressed." Id. at 627.

13

good continuity, and there was no evidence of hallucinations or delusions. (Tr. at 471-72.) He was oriented to person, place and time. Dr. Ortell concluded that plaintiff "clearly shows some cognitive impairment secondary to his head trauma . . . some mild dementia at the minimum. He appears also to have a schizo-affective disorder or possibly major depression, recurrent, with psychotic features although it appears that his psychoses have been persistent for time." (Tr. at 472.) Dr. Ortell's diagnoses were schizo-affective disorder, dementia secondary to a general medical condition, and rule out substance abuse, with a GAF of 45. Dr. Ortell's treatment plan included prescriptions for Zyprex, Zoloft and Trazodone. He stated that plaintiff "has never really worked so he has little interest in vocational rehabilitation." (Tr. at 472.)

Plaintiff returned to Dr. Ortell on September 8, 2003, and stated that he had been off his medication for some time, though the medication was helpful. He made good eye contact, was friendly and affable, with no evidence of EPS, tardive dyskinesia or any overt psychosis. Dr. Ortell altered and continued his medications. (Tr. at 473.)

On October 14, 2003, Dr. Ortell completed a check-box form for plaintiff's lawyer, indicating that plaintiff suffered from a psychotic disorder with psychotic features and deterioration (continuous). He indicated that plaintiff's condition was evidenced by delusions or hallucinations and incoherence (loosening of associations). (Tr. at 469.) He opined that plaintiff had marked difficulties in social functioning and deficiencies of concentration/persistence/pace resulting in frequent failure to complete tasks. (Tr. at 470.)

14

**B.** **Hearing Testimony**

    **1.** **Plaintiff**

At the hearing before the ALJ, plaintiff testified that he had been living with his mother for about two years. (Tr. at 489-90.) He stated that he had nine brothers and six sisters but did not see them very often because they told him what to do. He also had little contact with his children because he did not get along with the mothers. (Tr. at 491-92, 502.) He stated that he had one friend whom he saw once or twice per week. (Tr. at 491-92.) He stated that he was working with DVR and Goodwill Industries, though he was not clear on what he did. (Tr. at 492-93.) He said that on a typical day he did very little. (Tr. at 493.) He denied shopping or doing much around the house. He sometimes watched television and had no hobbies. (Tr. at 494.) He said that he was in a couple of car accidents over the last three years, in which he suffered head injuries, but he was unable to offer any details. (Tr. at 495, 499.)

Plaintiff said that his last job was with Goodwill. (Tr. at 495.) On questioning by the ALJ, he stated that he worked for the Milwaukee County Parks for an unspecified time in 2001 and got fired for fighting with his boss. He said that he was being picked on and heard voices. (Tr. at 500.)

Plaintiff stated that he heard voices, which would come and go all day, calling his name, but medication helped. (Tr. at 496.) He also stated that he felt "picked on a lot," and people thought he was dumb and called him names. He said he heard threatening voices sometimes. (Tr. at 497.)

Plaintiff testified that he was taking Zoloft, Zyprexa and Trazodone, but was unclear about when he took them. (Tr. at 497-98.) He said that he was seeing Dr. Ortell for his medications and went to his office a few times per week. (Tr. at 503.)

**2. Medical Expert**

The ALJ then called Alan Hauer, Ph.D., as a medical expert. Dr. Hauer testified that he had reviewed the entire record and heard the testimony at the hearing. Based on that information, he opined that the case should be reviewed under two Listings – 12.08, personality disorder and 12.09, substance addiction disorder. He disagreed with the diagnoses of schizo-affective disorder or a psychotic condition. He also disagreed with the diagnosis of depression, stating that the evidence was compelling for personality disorder, which would explain the affective elements and some of the other conduct problems. (Tr. at 504.) He noted various references in the record to an exaggeration of symptoms, of symptoms being inconsistent, and a probability of malingering, with which he concurred. (Tr. at 504-05.)

Dr. Hauer specifically endorsed a diagnosis of personality disorder, NOS, with anti-social, dependent and passive-aggressive features. He stated that plaintiff's depressive episodes were essentially reactions to life circumstances. (Tr. at 505.) Under the B criteria of the Listing, he rated a mild impairment in ADLs based on plantiff's financial dependence on others balanced against his ability to independently direct his own activities; moderate impairment in social functioning based on plaintiff's anti-social attitudes and conduct weighed against his ability to demonstrate good manners and social skills when motivated to do so; moderate difficulty in concentration/persistence/pace based on plaintiff's generally adequate concentration but deficit in his ability to persist in doing things he didn't want to do;

16

and one or two episodes of decompensation based on deterioration that tended to be acute or episodic. (Tr. at 506-07.) Dr. Hauer disagreed with a diagnosis of dementia secondary to head injury because the record showed only some headaches and cervical sprain, with no objective evidence supporting dementia. (Tr. at 507.) Dr. Hauer opined that drug and alcohol abuse were material factors because of plaintiff's long-term addiction; non-compliance with medication, treatment and appointments; conflicts with others; and inconsistent reports of abstinence. (Tr. at 508, 504.)

> Regarding plaintiff's claim of hearing voices, Dr. Hauer opined that those were

> of a non-psychotic nature, completely anathemical to what is seen in psychotic hallucinations and sensory kinds of misperceptions. They're too well organized. They're quite rationalistic in the sense of rationalizing conduct. They lack any bizarre nature, and without getting too technical, they're also generally quite egocentric which means very consistent with one's conscious experiences and those are not seen in true psychotic kind of phenomenon.

(Tr. at 509.) Dr. Hauer described plaintiff's affect at the hearing as controlled and related his lack of recall to his interest and motivation – when negative issues are brought up, "he tends to be quite vague" but when things are cast in a more positive light, "he was more specific and responsive." (Tr. at 510.) Dr. Hauer opined that plaintiff would have only a fair ability to deal with the public, which tended to be more demanding than co-workers, no difficulty with simple instructions, and fair ability to deal with complex instructions. (Tr. at 511-12.)

### 3. Vocational Expert

Finally, the ALJ called VE John Schroeder, who testified that plaintiff's past jobs (parks clean-up, warehouse work, housekeeping) were unskilled, light to medium work. (Tr. at 513.) The ALJ then posed a hypothetical question assuming an individual of plaintiff's

17

age, education and experience with no physical limitations, but with only a fair ability to deal with supervisors, the general public and complex instructions.  The VE opined that this person could do plaintiff's past work.  (Tr. at 513-14.)  In the event plaintiff's past work did not qualify as SGA, the VE further stated that such person could do cleaning/janitorial work (12,000 positions in SE Wisconsin), warehouse/shipping work (2500 positions), and grounds-keeping (1500 positions).  (Tr. at 514.)  The VE explained that he factored into the number of jobs the person's fair ability to deal with supervisors.  He also stated that these jobs involved little contact with the general public.  (Tr. at 515.)  All of the jobs described involved simple, repetitive, routine type of work.  (Tr. at 515.)

**C.    ALJ's Decision**

Based on this evidence, on April 12, 2004, the ALJ issued a decision finding plaintiff not disabled.  He concluded that while plaintiff had severe impairments (affective disorder, personality disorder, history of substance abuse), none met or equaled a listed impairment. He further found that plaintiff retained the RFC to perform non-complex work that did not require contact with the general public and, relying on the testimony of the VE, that there were a significant number of jobs available in the economy within those limitations.  (Tr. at 23-24.)  In so finding, the ALJ credited the opinions of Drs. Hauer and Rosen over those of Drs. Ortell and Pankiewicz primarily because the latter were based on sympathy and advocacy for plaintiff.  (Tr. at 23.)

18

## III. DISCUSSION

### A. Substantial Evidence Review

Plaintiff disputes the ALJ's decision to adopt the opinions of Drs. Hauer and Rosen over those of Drs. Ortell and Pankiewicz. He contends that the ALJ should not have given more weight to the consultants than to his doctors, who diagnosed him with schizo-affective disorder, dementia secondary to head injury, and depression.

#### 1. Legal Standard for Review of Medical Opinions

Under SSA Rulings and Regulations, the ALJ evaluates medical opinions differently depending on the source. Opinions from the claimant's treating physician (a/k/a "treating source") are, if "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent" with other substantial evidence, afforded "controlling weight." 20 C.F.R. § 404.1527(d)(2). If the ALJ finds that the treating source opinion is not entitled to controlling weight, he must consider what other weight to give it by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors." 20 C.F.R. § 404.1527(d).

If a medical provider who personally evaluated the claimant does not qualify as a treating source, s/he will nevertheless be considered an "examining source," whose opinion is generally entitled to more weight than that of a provider who did not examine the claimant. 20 C.F.R. § 416.927(d)(1); see also Criner v. Barnhart, 208 F. Supp. 2d 937, 953 (N.D. Ill. 2002) (citing Whitney v. Schweiker, 695 F.2d 784, 789 (7th Cir. 1982); Allen v. Weinberger, 552 F.2d 781, 786 (7th Cir. 1977)). Finally, the reports of non-examining or consultative

19

sources must also be considered, 20 C.F.R. § 416.927(f), although such opinions do not, by themselves, constitute substantial evidence sufficient to justify the rejection of a treating physician's opinion, Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003).

Notwithstanding the preference afforded the treating physician's opinion, the Seventh Circuit has stressed that "'it is not the final word on a claimant's disability.'" Books v. Chater, 91 F.3d 972, 979 (7th Cir. 1996) (quoting Reynolds v. Bowen, 844 F.2d 451 (7th Cir. 1988)). A claimant is not entitled to disability benefits simply because his physician states that he is unable to work. The Commissioner, not a doctor selected by a patient to treat him, decides whether a claimant is disabled.

> We must keep in mind the biases that a treating physician may bring to the disability evaluation. The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise.

Dixon v. Massanari, 270 F.3d 1171, 1177 (7th Cir. 2001) (internal citations and quote marks omitted).

### 2.    Application to the Present Case

In the present case, the ALJ found that Drs. Ortell and Pankiewicz "were much more sympathetic to claimant's situation and some of their comments [had] advocacy oriented elements to them." (Tr. at 22.) He gave little weight to the check box form completed by Dr. Ortell because of the "clear advocacy elements," or to the report of Dr. Pankiewicz due to the circumstances surrounding plaintiff's referral in a pending criminal case. (Tr. at 23.) Instead, he found that Drs. Rosen and Hauer were more credible because they viewed the matter objectively and in light of the entire record. (Tr. at 22-23.)

20

I cannot conclude that the ALJ committed reversible error in this regard. I first note that Dr. Pankiewicz evaluated plaintiff just once in connection with a criminal case and does not qualify as a treating source.[8] Therefore, the ALJ was not required to give his opinion any special consideration.

For several reasons, it was not unreasonable for the ALJ to weigh the opinions as he did. First, as the ALJ noted, Drs. Ortell and Pankiewicz lacked the consultants' familiarity with the entire record. Dr. Pankiewicz's report indicated that he reviewed only plaintiff's medication list and his records from the MCMHC. Dr. Ortell's records do not reveal what information he had available. Thus, both likely had to rely substantially on plaintiff's statements, and as virtually every professional who interviewed plaintiff agreed, plaintiff was a poor historian. Thus, basing an opinion significantly on plaintiff's statements ran the risk of error (or at least the ALJ could reasonably conclude). For instance, the record contains no medical evidence of a severe head injury causing dementia or other cognitive problems. It appears that Drs. Ortell and Pankiewicz's statements regarding this injury were based on plaintiff's reports, but plaintiff was unable to offer any specifics on his head injuries, either

---

[8]To qualify as a treating source, the physician, psychologist or other acceptable medical source must provide the claimant with medical treatment or evaluation and have or had an ongoing treatment relationship with him. The pertinent SSA regulation states: "Generally, we will consider that you have an ongoing treatment relationship with the source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s). . . . We will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, but solely on your need to obtain a report in support of your claim for disability. In such a case, we will consider the acceptable medical source to be a nontreating source." 20 C.F.R. 404.1502. It is also worth noting that at the time he completed the check box form for plaintiff's lawyer, Dr. Ortell had seen plaintiff only twice.

to the doctors who evaluated him or at the hearing before the ALJ.  Neither did Drs. Ortell and Pankiewicz account for the significant and ongoing reports of malingering in the record, from both treating and evaluating sources (perhaps because they were unaware of them). (E.g., Tr. at 203, 216, 399, 416.)

Second, Dr. Ortell's conclusions on the check box form provided by plaintiff's lawyer were inconsistent with his treatment notes.  As the ALJ noted, at their initial meeting on August 7, 2003, Dr. Ortell noted that plaintiff was cooperative and friendly, well-groomed, and his speech was easily understood (although he provided little information).  (Tr. at 21, 471.)  There was no evidence of psychomotor agitation, hallucinations or delusions. Plaintiff's affect was euthymic and his thoughts flowed with good continuity.  (Tr. at 471.) A month later, Dr. Ortell noted that plaintiff made good eye contact, was friendly and affable, with no evidence of psychosis.  (Tr. at 473.)  Nevertheless, on the check box form, Dr. Ortell stated that plaintiff suffered continuous psychotic features and deterioration, delusions and hallucinations, and incoherence.[9]  (Tr. at 469.)

Third, although Dr. Pankiewicz stated that plaintiff qualified for SSI, it is not clear that he understood the standard for obtaining benefits.  For example, he (and Dr. Ortell) considered significant plaintiff's history of unemployment.  Yet social security regulations make clear that inability to get work is not a relevant consideration.  See 20 C.F.R. § 404.1566(c).  Moreover, bald statements that a person is disabled or qualifies for benefits

_____

[9]These conclusions are also inconsistent with the June 2002 MCMHC records, which indicate that plaintiff's thought process was logical and he displayed no evidence of delusions or hallucinations.  (Tr. at 399.)

are worth little because these are questions for the Commissioner, not a doctor.  See SSR 96-5p.

Fourth, Dr. Pankiewicz stated that the MCMHC records showed a regular diagnosis of psychotic illness over the past four years.  The first diagnosis of psychosis, NOS, was made in February 1998 at MCMHC, but there was little supporting data.  (Tr. at 314-15.)  It was not mentioned again until June 2002, when a MCMHC record lists psychosis, NOS, as a historical diagnosis "per chart."  (Tr. at 399.)

Thus, it was not unreasonable for the ALJ to conclude that the reports of Drs. Ortell and Pankiewicz were not well-supported by data and were inconsistent with the evidence of record, and that they instead acted out of sympathy.  See Stephens v. Heckler, 766 F.2d 284, 289 (7th Cir. 1985) ("The patients' regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").  It was also not unreasonable for him to find that the opinions of Drs. Rosen and Hauer were consistent with the entire record and thus to assign greater weight to them.  For example, Dr. Rosen's mental status exam revealed that plaintiff seemed to process well enough, did not present as clinically depressed or psychotic, and with no clinical indication of auditory or visual hallucinations or a thinking disorder.  (Tr. at 413.)  This was consistent with the June 2002 mental status exam done at MCMHC (Tr. at 399) and Dr. Ortell's evaluation of August 7, 2003 (Tr. at 472-71).  Further, Drs. Rosen and Hauer acknowledged the reports of malingering and exaggeration in the record, and Dr. Rosen found the same tendencies in her evaluation.  (Tr. at 414, 505.)  Finally, Dr. Hauer explained why plaintiff's reports of hearing voices did not support a finding of a psychotic condition because they were too "rationalistic" and "egocentric."  (Tr. at 509.)  His assessment was consistent with Dr.

23

Rosen's experience that when she disallowed plaintiff's request to open the door to the interview room his complaints of hearing voices disappeared. (Tr. at 410.) Dr. Hauer also noted the lack of neuro-psychological evidence of dementia secondary to head injury. (Tr. at 507.)

Therefore, based on a review of the entire record, I cannot conclude that the ALJ committed reversible error in crediting the reports of Drs. Hauer and Rosen over Drs. Ortell and Pankiewicz.[10]

## B.    New Evidence

As noted, the court may not reverse an ALJ's decision based on evidence that was not before him. However, the court may remand a case (without entering judgment) for consideration of "new" and "material" evidence under § 405(g), sentence six. Therefore, I will review the additional materials plaintiff submitted to see if they satisfy this standard.[11] In making this determination, I keep in mind that, although plaintiff proceeds pro se in this court, he was represented by counsel before the ALJ, and I may presume that a claimant represented by counsel in the administrative hearings has made his best case. See Glenn v. Sec'y of Health and Human Servs., 814 F.2d 387, 391 (7th Cir. 1987).

---

[10]The ALJ could have provided a more thorough explanation for his decision. However, as the Seventh Circuit held in a case quite similar to this one: "No principle of administrative law or common sense requires [the court] to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result." Fisher v. Bowen, 869 F.2d 1055, 1057 (7th Cir. 1989).

[11]As the Commissioner notes, courts should not grant relief under sentence six unless the plaintiff asks. See Eads, 983 F.2d at 817. It is true that plaintiff has not made a specific request under sentence six, however, given his pro se status, I will consider his submissions as an implied request.

24

**1.    Records Attached to Main Brief**

In his main brief filed November 17, 2004, plaintiff argued that he was prevented from working due to a head injury he suffered in a July 23, 2004 auto accident.  He also attached records from Goodwill Industries, the Wisconsin Division of Vocational Rehabilitation (DVR), and additional reports from Dr. Ortell.  He stated that these records show that he cannot hold a job.

The first "new" record attached to the main brief was a monthly progress report from Goodwill Industries.  The report indicated that plaintiff returned to "training" on 7/22/03; on the first day he left early, and on the second he called to try to swap days, which request was refused.  The reviewer commented that plaintiff was always pushing the rules and got angry when corrected.  The reviewer further stated that plaintiff knew his job duties and could work when he applied himself, focused and took his medication.  However, he was not at competitive speed and his quality of work varied from day to day.  Plaintiff makes no showing that this evidence was not in existence prior to the ALJ's decision of April 12, 2004, that it was unavailable to him, or that there is other good cause for his failure to present it sooner.  Further, he makes no showing that it is material.  On the contrary, this record seems to support Dr. Hauer's assessment of plaintiff's ability to work.[12]

The next "new" record is a May 17, 2004 letter from Dr. Ortell to plaintiff's DVR case worker, in which Ortell repeated plaintiff's diagnoses then stated that plaintiff pushed the

---

[12]Another sheet from Goodwill, dated 8/15/03, stated that plaintiff should be stable on his medication for at least 30 days before starting a new Goodwill program.  However, this sheet contains no information about defendant's functioning and cannot be considered material.  Nor does plaintiff present good cause for his failure to present it previously.

rules at HCH, displaying anger and aggression when corrected or redirected concerning policies. He further stated that plaintiff does not keep his appointments. This record post-dates the ALJ's decision and contains no information that was not before the ALJ; the ALJ knew of Dr. Ortell's diagnoses and of plaintiff's behavioral problems. Further, there is no likelihood that evidence of plaintiff's anger and aggression at Dr. Ortell's staff would change the ALJ's mind.[13]

Finally, plaintiff attached a letter from his lawyer and two other papers pertaining to a 7/23/04 motor vehicle accident. This accident post-dated the ALJ's decision, and if plaintiff suffered disabling injuries as a result, his remedy is to file a new application for benefits. Such injuries are not a basis for re-visiting the decision on this application. See Schmidt, 395 F.3d at 742 (stating that medical records based on treatment rendered after ALJ's decision are not material).

### 2. January 26, 2005 Submission

Shortly after the Commissioner filed her response brief on January 20, 2005, plaintiff submitted another batch of extra-record evidence.[14] Most of the records, including records from MCMHC dated 12/30/04 & 1/6/05, a 12/29/04 note from Dr. Ortell, records from Froedert Hospital dated 12/31/04 and 1/7/05 pertaining to a hand injury, a 12/31/04 bill from

---

[13]Plaintiff also attached May 17, 2004 questionnaires Dr. Ortell filled out for DVR and OIC-GM, which basically re-stated his diagnoses. There was really nothing new on these forms, though on the OIC form Dr. Ortell did state that plaintiff's problems would restrict, rather than prevent, employment. Aside from post-dating the ALJ's decision, there is no reasonable likelihood that this evidence would change the ALJ's mind.

[14]The first few pages of the submission consisted of the July and August 2003 Goodwill reports, which were also attached to plaintiff's main brief and which I have already discussed.

Case 2:04-cv-00806-LA   Filed 07/19/05   Page 26 of 29   Document 26

Curtis Ambulance, and a 10/15/04 list of medications, post-date the ALJ's decision. Medical records postdating the hearing do not meet the standard for new and material evidence. Id. A few records pre-date the decision, but none are material. A March 22, 2004 paper from St. Michael's Hospital listing the names of various hand surgeons says nothing about any disabling condition. A March 30, 2004 record from Milwaukee County Behavioral Health simply lists plaintiff's medications, which the ALJ already knew. A computer print out listing the times plaintiff went to MCMHC from 1990 to 2004 says nothing relevant to disability and little the ALJ did not know. Therefore, none of these records are new and material, nor has plaintiff demonstrated good cause for not presenting any of them to the ALJ.

### 3. February 4, 2005 Submission

On February 4, 2005, plaintiff submitted a Mental Impairment Questionnaire (RFC and Listings) from Dr. Ortell dated 2/3/05, which contained more detailed information concerning plaintiff's functioning. However, the report was based on examinations all but two of which post-dated the ALJ's decision. Thus, the questionnaire is not material. Id. Moreover, plaintiff has failed to explain why a report of this sort was not solicited and presented at the hearing, where, as noted, plaintiff was represented by counsel. Finally, much of the information in the report was before the ALJ. Thus, it does not support a sentence six remand.

### 4. February 7, 2005 Submission

In this submission, plaintiff again included the 2/3/05 report from Dr. Ortell and records from MCMHC that were part of previous submissions. Thus, I need not address them again.

27

### 5.    March 7, 2005 Submission

This submission consisted of a 3/7/05 MRI report, a 3/7/05 CT scan, a 3/10/05 prescription for Vicodin, and a return to work report, all related to a work-related back injury plaintiff sustained on on 12/18/04.  Obviously, this evidence does not pertain to plaintiff's condition at the time his application was under consideration by the SSA, and thus it is not material.  Id.  Moreover, this evidence shows that plaintiff was, in fact, working at this time.  That fact would not change the ALJ's decision that plaintiff was not disabled.

### 6.    April 8, 2005 Submission

In his April 8, 2005 brief, submitted in response to my order allowing him to explain the purpose of his extra-record submissions, plaintiff stated that the records were "basically the same about my health just updated for the new year."  He attached to the brief a 3/8/05 letter from St. Paul Traveler's Insurance about his 12/18/04 work-related back injury, which stated that according to an independent medical exam (a copy of which was also attached), plaintiff could return to full duty work; a return to work slip from plaintiff's treating doctor (Dr. David Drury) dated 3/25/05; a slip from another doctor (Dr. Vance Masci) keeping plaintiff off work a few more days, and a few other records from Dr. Masci;[15] and the MRI reports dated 3/7/05.[16]  These records all pertain to plaintiff's 12/18/04 work-related injury, which post-dated the ALJ's decision.  Further, the records show that plaintiff had been working and

---

[15]In one of the records, plaintiff told Dr. Masci that his injury "occurred while he was working in his usual job for New Product Movers; he states he had been on the job for about two years."  (R. 22, 4/25/05 Record from Milwaukee Occupational Medicine, Vance Masci, M.D.)

[16]The last two pages of the submission consisted of the 8/7/03 treatment note from Dr. Ortell, which is part of the administrative record.

could, even after the injury, continue to work.  This evidence would not change the ALJ's mind.

In sum, none of these records satisfy the test for new and material evidence.  Thus, not only may I not consider them in reviewing the ALJ's decision, they do not form a basis for a sentence six remand.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is **AFFIRMED**, plaintiff's implied request for a sentence six remand is **DENIED**, and this case is **DISMISSED**.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 19th day of July, 2005.


/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

29